## Charles J. Majewski, Appellee, v. Florence Majewski, Appellant.

### Gen. No. 10,042.

Opinion filed March 8, 1946. Released for publication April 1, 1946.

Looze & Kinne, of Crystal Lake, for appellant.

Philip R. Davis, of Chicago, for appellee.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

Charles J. Majewski and Florence Majewski were married in April 1930, and lived together as husband

and wife until August 11, 1944. They have two daughters, Jacqueline, age 12 and Maxine, age 5. On August 14, 1944, Charles J. Majewski filed a suit for a divorce in the circuit court of McHenry county, charging his wife, Florence Majewski, with having committed adultery with one, John Doe, on August 11, 1944. The complaint is sworn to by the said Charles J. Majewski on August 11, 1944.

To this complaint the defendant, Florence Majewski, filed her answer, and denied that she was guilty of committing adultery on August 11, 1944, with John Doe, or with any other person at any time or place. She also filed a cross complaint asking for separate maintenance. The case was submitted to the court without a jury who found the issues in favor of the plaintiff, and that the defendant, on August 11, 1944, and on divers other occasions, committed adultery with the said John Doe. A decree was entered accordingly. The cross complaint for separate maintenance was dismissed. It is from this decree and order that Florence Majewski has perfected an appeal to this court.

The plaintiff, in his own behalf, testified that he was a postal clerk in the City of Chicago; that on August 11, 1944, he came home from work and found Mrs. Mabel Herzstock in the dining room at his home arranging her hair; that he asked the whereabouts of his wife; that she told him that his wife was out back of the house; that he went to the back door, and saw a car standing in the lot back of his home; that the ground slopes considerably down to a depression in the back of his home; that there are bushes and trees in this depression in which he had a large tent for the children to play in; that he walked down towards this tent to speak to his wife when he heard voices; that he heard voices; that he heard mumbles and highly emotional cries, low cries and mumbles; that he looked into the tent, and no one was in it; that he then became suspicious and walked around the tent quietly, and he saw

his wife and the said John Doe locked in each other's arms, and in the act of sexual intercourse; that his wife was dressed indecently in shorts, which were large legged; that there was a bottle of liquor, and they were drinking and imbibing at the time when he first saw them. This evidence was given at the preliminary hearing of the case.

The plaintiff testified at the hearing that Mrs. Herzstock had been a frequent visitor at their home; that as he came into his home on the morning of August 11, he made inquiry in regard to his wife; that Mrs. Herzstock was in the house and rearranging her hair; that after making inquiry in regard to where his wife was, he went down to the back of the lot; that he went out to look to see where his wife was; that he found her back of the tent, which was back of the house, in a hollow; that she was there with a neighbor, John Doe; that he saw them in the act of sexual intercourse, and stood and watched them for about four minutes before either of them saw him; that there was a bottle of liquor on the ground, and they were reaching for the liquor to take a drink before either of them saw him watching them; that he watched them for about four minutes without saying a word to either of them; then he said to his wife, "You are not a satisfactory mother to be here with the children; now you have 30 minutes to get in, get your things you need, and get out; you are no longer wanted around here;" that he did not say a word to John Doe and the wife did not say a word to him in reply; that his wife followed him back to the house; that he did not say anything to his wife after she entered the home; that he handed Mrs. Herzstock the keys to his car, and said: "Take the children out of here; get your suitcases and take my children along with you, because this is no place for them; my wife was back there; she has been drinking back there; my wife is carrying on back there; she is doing some awful ugly things that a mother shouldn't be doing, and

drinking;'' that Mrs. Majewski did not say a word at that time, and did not deny the accusation.

To support the plaintiff's case, Mrs. Herzstock was called as a witness and told of frequent visits of John Doe to the home of the Majewski's and of trips that she and Mrs. Majewski had taken with John Doe and that several times they were drinking. She also told of John Doe coming to the home the morning of August 11, but testified to nothing which corroborated the testimony of the plaintiff that his wife actually committed adultery.

Jacqueline Majewski was called by the father to support his case. She testified that when the mother came in, she was wearing loose shorts and her hair was rather mussed and her clothes were not very tidy.

Mrs. Majewski testified in her own behalf. She admitted going out riding on several occasions with John Doe and Mrs. Herzstock, and drinking on several occasions, but denied *in toto* any acts of adultery with John Doe, or any other person at any time, or any place. She stated that John Doe came to their home frequently; that he was a farmer; that he had a cow from which they obtained milk daily; that they would use the cream and what milk they needed, then John Doe would come practically every day, and get the milk not used, and other scraps from the kitchen to feed some hogs that he had at his place which adjoined the Majewski lot; that John Doe came to their home August 11, 1944; that they had two lambs, that were tied at the back of the lot, and she asked him to go down and see these lambs in regard to their feed, as she thought they were too fat; that they stood there at the fence watching the sheep and talking when John Doe squatted down on the ground, and she sat down about 5 or 6 feet away from him and they were in that position when her husband came and ordered her to get her things and get out; that she started to say that she had done nothing wrong, but he would not give her

an opportunity to say anything; that she followed him into the house, and called her brother and told him that she was ordered out of her home, and for him to come and get her. She also testified (which is not denied), that the shorts she was wearing was a gift to her from her husband.

The John Doe referred to in the testimony and complaint, was called as a witness in behalf of the defendant, and testified as to his correct name; that on Aug. 11, 1944, he lived as neighbor to the Majewski's; that he arrived at the Majewski home about 11:30 and had a bottle of liquor with him; that he saw Mrs. Herzstock and Mrs. Majewski, and sat on a bench talking; that he offered the ladies a drink and Mrs. Herzstock took the first one, and that during the time they were sitting on the bench, which was probably 30 or 40 minutes, Mrs. Herzstock took three drinks, and then went into the house; that he and Mrs. Majewski went back to look at some sheep that were in the backyard; that they were looking at the sheep and talking for about ten minutes; that they had several drinks while in the backyard; that he had several and Mrs. Majewski had one drink; that he was crouched down on his heels and Mrs. Majewski was sitting down on the grass when Mr. Majewski came up and said: ''Get your things and get out of here.'' That Majewski didn't say a word to him, and he didn't say a word to Majewski; that he walked over to the fence, got into his car and drove away. He denied positively, that he had ever engaged in sexual intercourse with Mrs. Majewski.

Mr. J. P. Lang testified that he was a neighbor of the Majewski's and by profession, a veterinarian; that on the 11th of August 1944, he had been out at work and came home about 11 o'clock in the morning; that he has a lot surrounded by an electric fence that adjoins the property of the Majewski's; that he was working on this fence from about 11:30 until after 1:00 o'clock;

that he saw John Doe and Mrs. Majewski come to the back of the Majewski property, and standing at the fence looking at some sheep; that John Doe and Mrs. Majewski were in plain view of him all of the time, that he was working on his fence; that he heard them talking, but did not hear what they said; that his attention was first attracted to them by the lambs, blatting; that he saw John Doe sitting on his heels and Mrs. Majewski was standing, but a little later sat down on the grass; that the vegetation around where they were, did not exceed 6 or 8 inches in height; that a little later he saw Mr. Majewski come down the path and around to where the two people were sitting; that they were in that position when Mr. Majewski saw them; that Majewski stood there for a minute, then turned around and went back to the house; that he could hear voices, but could not distinguish what was said; that Mrs. Majewski followed her husband into the house and John Doe got up and went away.

Dr. Lang further testified that he had a conversation with Charles Majewski that same evening; that they were again in their backyards, and Mr. Majewski called over the line fence, and asked him if he would take care of his lambs, and the doctor told him that he would; that Majewski said he had had trouble with his wife and had started divorce proceedings; that he tried to reason with Majewski, but he didn't have a chance to say anything, then finally Majewski said: ''After what I saw last night, I am all washed up,'' and he did not mention at all that he had caught his wife in any misconduct that forenoon.

William Beecham testified that he was a brother of Mrs. Majewski, and that his sister called him on August 11, 1944, and that he talked to her over the telephone; that it was about 20 minutes after twelve; that after the conversation, he drove his car to his sister's home and was met at the door by his brother-in-law, Charles Majewski who said: ''Have they called you

already?'' ''Did they get in touch with you already?''
He, Beecham; answered, ''What do you mean?'' To
which Majewski replied: ''What, did they get in touch
with you already?'' To which the brother-in-law re-
plied: ''Just a few minutes ago, and I don't know
what it is all about.'' At that time his sister came in
and he asked her what it was all about; to which Ma-
jewski replied: ''I saw Flo sitting on,—sitting on
John Doe's knee in the kitchen sharing a bottle of beer
between them,'' then he turned directly to Mrs. Ma-
jewski and said: ''And you can't deny it, get your
things together, and get out of here,'' then Majewski
turned to the witness, and said: ''Be sure she doesn't
take anything else than just what belongs to her, and
her only.'' On cross-examination the brother was
asked whether the sister denied that she was sitting on
the man's lap and sharing a bottle of beer. His reply
was, ''It is impossible for me to answer the question,
yes, or no, because the sister would open her mouth to
speak, and was not given a chance.''

Considerable space is devoted in the brief and argu-
ment of the appellee to the fact that the wife never de-
nied the accusation of adultery when she was so
charged by her husband. An examination of the evi-
dence, as abstracted, fails to disclose that at any time
did the husband charge his wife with adultery, or hav-
ing illicit intercourse at any time with John Doe, or
with any other person. He admits in his testimony on
cross-examination that he never at any time, charged
his wife with adultery, until he started his suit for a
divorce, which the records show was the afternoon of
the day of the trouble. He told the neighbor of whom
he was asking a favor, that the reason he had started
this suit for divorce was because of something he had
seen the night before, but he did not charge his wife
with adultery, which he now claims that he had seen
committed but a few hours before.

It is a well known fact that adultery is usually com-
mitted in secret, and the neighbors are excluded from

seeing it. It seems strange that two people in committing adultery, would go back of a tent in plain view of a neighbor, and commit the act openly when they could very conveniently have gone into the tent, and be secluded from the public eye. In the early case of *Blake v. Blake*, 70 Ill. 618, it is stated: ''It is exceedingly important for the well-being of society that a check should be placed upon the tendency of the age to sever the marriage relation, and more especially should clear proof be required when the result of the verdict sought to be obtained will publish a defendant to the world as a prostitute, and brand the children of complainant as the descendants of an unchaste woman.''

It is stated in *Eames v. Eames,* 133 Ill. App. 665, 670; ''In no event can the unsupported testimony of the charging party, when met with the denial of the party accused of adultery, and with other corroboration, warrant a decree of divorce upon so serious a charge.''

In *Hoef v. Hoef,* 323 Ill. 170, we find this language: ''Defendant in error testified to seeing his wife go into Curless' room a few times, where she remained two or three minutes. He testified that on another occasion when he got up early in the morning he went into the cellar and looked through the place where the cold air pipe of the furnace had been disconnected at the floor and saw Curless in the parlor, sitting in a rocking chair, and that his wife came into the room and sat down for a short time on Curless' lap, but that he did not see him kiss her or hear anything said. She denied this episode. He testified that he accused her of intimacy with Curless and that she made a remark which would tend to show her guilt. This she denied, as she also denied specifically the charge of adultery. It being important to the well-being of society that the marriage relation should not be severed, where a divorce is sought from a wife for adultery the proof to warrant a decree must clearly convince the mind affirmatively that actual adultery was committed, as

nothing short of the carnal act can lay the foundation for such divorce. *Blake v. Blake,* 70 Ill. 618.''

We are not unmindful of the rule that reviewing courts hesitate to reverse a case tried by a judge without a jury, as the presumption is that the trial judge considered only the competent evidence. He sees and hears the witnesses testify, however, when there is a lack of evidence to sustain the judgment, or decree, reviewing courts will not hesitate to reverse the same.

After reviewing the evidence in this case, it is our conclusion that it falls far short of being of such convincing nature as to establish that the defendant was guilty of adultery, as charged in the complaint. The decree of the circuit court granting the plaintiff a divorce, and dismissing the defendant's cross complaint for separate maintenance is hereby reversed, and the cause remanded to said court.

*Reversed and remanded.*